Matthew T. Findley, ABA #0504009
ASHBURN & MASON, P.C.
1227 W. Ninth Ave., Suite 200
Anchorage, Alaska 99501
907-276-4331
matt@anchorlaw.com

*Attorneys for Plaintiff VOICE of the Arctic Iñupiat*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| VOICE OF THE ARCTIC IÑUPIAT,<br><br>                    Plaintiff,<br><br>    v.<br><br>BUREAU OF LAND MANAGEMENT;<br>UNITED STATES DEPARTMENT OF<br>THE INTERIOR; DEB HAALAND, in her<br>official capacity as Secretary of the Interior;<br>and STEVEN COHN, in his official capacity<br>of Alaska State Director of Bureau of Land<br>Management,<br><br>                    Defendants. | Case No. 3:24-cv-_____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

(Naval Petroleum Reserves Production Act 42 U.S.C. §§ 6501 *et seq*.;
Alaska Native Claims Settlement Act 43 U.S.C. §§ 1601, *et seq*.;
Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq*.;
National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq*.;
Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701 *et seq*.;
Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiff VOICE of the Arctic Iñupiat ("VOICE") by and through undersigned

counsel, alleges and pleads as follows:

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 1 of 68

## <u>INTRODUCTION</u>

1.      VOICE challenges the final rule issued by the Bureau of Land Management ("BLM") titled "Management and Protection of the National Petroleum Reserve in Alaska" published in the Federal Register on May 7, 2024 ("NPR-A Rule" or "Final NPR-A Rule"). The Final NPR-A Rule turns a petroleum reserve into millions of acres of *de facto* wilderness by barring oil and gas development in 10.6 million acres of the NPR-A, effectively ending any further leasing and development in another 13.1 million acres of existing "Special Areas" within the NPR-A, erecting significant and onerous barriers to new roads and other infrastructure development in large swaths of the NPR-A, and providing for the regular creation of *additional* Special Areas which would be effectively off limits to development.

2.      The Final NPR-A Rule is directly contrary to Congress's stated purpose in creating the NPR-A, which was to increase domestic supplies of oil, and Congress's mandate that BLM conduct "an expeditious program of competitive leasing of oil and gas" in the NPR-A.[1]  For over 40 years BLM managed the NPR-A consistent with these Congressional directives, in regular consultation with local stakeholders, and successfully balanced the NPR-A's primary purpose of furthering oil and gas exploration and development with appropriate conservation and protection measures.  Not anymore.  The Final NPR-A Rule is a complete departure from this long-standing management practice

---

[1] Department of Interior and Related Agencies Appropriations Act, Pub. L. No. 96-514, Title I, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C.§ 6508).

that will unilaterally impede economic development on the North Slope without Congressional authorization. As Alaska's United States Representative Mary Peltola stated when the Final NPR-A Rule was announced, "[c]losing off NPR-A is a huge step back for Alaska, failing to strike a balance between the need for oil and natural gas and legitimate environmental concerns, and steamrolling the voices of many Alaska Natives in the decision-making process."

3. Even more disappointing is that BLM proposed and enacted the Final NPR-A Rule under an artificially compressed timeline and failed to engage meaningfully with the North Slope Iñupiat and their elected leaders and representatives. The rulemaking process was rife with cancelled meetings, unreturned phone calls, and complete disregard for any feedback North Slope leaders were able to provide. This is likely because the North Slope Iñupiat, tribes, Alaska Native Claims Settlement Act ("ANCSA") Village Corporations, ANCSA Regional Corporation, and elected leaders have been consistently unanimous in their opposition to the Final NPR-A Rule.

4. BLM disingenuously claims that the Final NPR-A Rule speaks for Alaska Natives on the North Slope, but this assertion is simply untrue. As VOICE stated in April 2024 when the Final NPR-A Rule was announced: "[t]he federal government has again excluded the Indigenous North Slope Iñupiat from policymaking by issuing a final rule for the NPR-A that does not reflect our communities' wishes. The Final NPR-A rule will hurt the very residents the federal government purports to help by rolling back years of

progress, impoverishing our communities, and imperiling our Iñupiaq culture."[2]

5. The NPR-A is located entirely within the North Slope Borough and the impact of the Final NPR-A Rule on those who live in the region will be devastating. Stymieing further oil and gas activities in the NPR-A jeopardizes economic growth and opportunity for all North Slope residents and threatens the livelihoods of thousands of Iñupiat. For example, the North Slope Borough was created to ensure that the local people would benefit and be provided services from the oil and gas industry through the ability to tax industry. These tax receipts provide the vast majority of revenue for the North Slope Borough, which is then used to provide a wide range of essential public services, including sewer, water, heat, sanitation, schools, clinics, hospitals, wildlife and fisheries management and research, infrastructure, and social and cultural programs. The North Slope Borough is also the largest employer for the citizens of the Borough. Further, the oil and gas industry itself is also a valuable source of local employment on the North Slope; more than one-third of jobs held by Borough residents are directly or indirectly supported by the oil and gas industry. BLM's actions here place all these economic benefits in serious jeopardy.

6. Finally, the region's ANCSA Regional Corporation, Arctic Slope Regional Corporation ("ASRC") owns 74,000 acres of surface/subsurface property within the NPR-A, all of which was conveyed to ASRC in exchange for extinguishing the

---

[2] https://voiceofthearcticinupiat.org/wp-content/uploads/2024/04/NPR-A-Press-Release-4.19.24.pdf.

COMPLAINT
*Voice of the Arctic Iñupiat v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____

Iñupiat's Indigenous land claims. Rendering these land selections effectively off limits to further development is contrary to ANCSA's purpose of furthering Native economic self-determination and constitutes an abdication of Congress's promises to Alaska's Indigenous people.

7. VOICE files this complaint to give effect to the voices of the North Slope Iñupiat and their elected leaders who overwhelmingly oppose the Final NPR-A Rule and who have been ignored throughout this entire process. VOICE and its members have a steadfast commitment to ensuring self-determination, which can include responsible resource development on their ancestral lands because it is essential to the economic, community, and cultural survival of the North Slope Iñupiat. The Final NPR-A Rule fails to recognize the complex but critically important role that oil and gas plays in advancing the interests of all people on the North Slope. As the North Slope Borough mayor stated in response to the Final NPR-A Rule "[w]e deserve the same right to economic prosperity and essential services as the rest of this country and are being denied the opportunity to take care of our residents and community with this decision. It is insulting and, unfortunately, representative of the federal government's treatment of our Indigenous voices for decades."

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331 (action arising under the laws of the United States), 28 U.S.C. § 1346

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 5 of 68

(civil action against the United States founded upon the Constitution, an Act of Congress, or an executive regulation), 28 U.S.C. § 1361 (action to compel officer or agency to perform duty owed to Plaintiff), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act). An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 705-706.

9.      This Court has personal jurisdiction over the individual defendants by virtue of 28 U.S.C. § 1391(e) because the individual defendants reside in this district and because the individual defendants are officers and employees of an agency of the United States and are being named in their official capacity.

10.     This Court has jurisdiction over defendants the Department of the Interior and the Bureau of Land Management pursuant to 5 U.S.C. § 702.

11.     Pursuant to 28 U.S.C. § 1391(e) venue is proper in this Court because the lands subject to this dispute are located in this district, and events giving rise to this dispute occurred in this district.

12.     This matter is timely pursuant to 28 U.S.C. § 2401 because the first decision being appealed is dated May 7, 2024, and is timely under 42 U.S.C. § 6506a(n)(1) to the extent this provision applies.

13.     BLM's Issuance of the NPR-A Rule on May 7, 2024 is a final agency decision subject to judicial review under the Administrative Procedure Act ("APA"), 5

U.S.C. §§ 701 – 706.

14. An actual controversy presently exists between the parties concerning the validity of various regulations. That controversy is justiciable in character, and speedy relief is needed to preserve plaintiff's rights.

15. A declaratory judgment will terminate the uncertainty and controversy between the parties.

## **PARTIES**

16. Plaintiff VOICE was formed in 2015 as a 501(c)(4) nonprofit corporation, creating a communication network amongst North Slope communities to establish a unified voice for its region and people. Its twenty-three member organizations work together to ensure that the collective voices of those who live in the Arctic are heard and respected – locally, regionally, and nationally. VOICE's purpose is to: (a) provide local advocacy and engagement to state, federal and international forums addressing Arctic issues; (b) promote an understanding of the North Slope economy and encourage culturally responsible development for economic sustainability; (c) develop local content and responses with respect to activities within our region that allow for protection of our land, waters and subsistence resources; (d) become the local knowledge center for our communities and people regarding developments in the Arctic Slope region; (e) act to protect the interests of North Slope Iñupiat; and (f) be a conduit for information transfer with outside organizations, including both governmental and non-governmental entities.

17.    VOICE is comprised of twenty-three member organizations of local governments, tribal governments, tribal service providers, ANCSA Corporations, and other North Slope serving entities across the North Slope of Alaska. It speaks on behalf of the following:

   a.    **Arctic Slope Native Association**, the tribal nonprofit health and social services organization serving the eight villages of the North Slope – Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiaġvik, and Wainwright;

   b.    **Arctic Slope Regional Corporation**, the Alaska Native regional corporation serving the interests of its over 14,000 Iñupiaq shareholders, headquartered in Utqiaġvik and serving the interests of shareholders residing in the North Slope villages of Anaktuvuk Pass, Atqasuk, Utqiaġvik, Kaktovik, Nuiqsut, Point Hope, Point Lay, and Wainwright;

   c.    **Atqasuk Corporation**, the Alaska Native village corporation owning approximately 73,000 acres of subsistence rich land and serving its Iñupiaq shareholders through an elected Board of Directors;

d.    **City of Anaktuvuk Pass**, the last remaining settlement of the inland North Slope Iñupiat and location of a historic caribou migration route;

e.    **City of Atqasuk**, the site of long-established hunting and fishing grounds located on the Meade River, 60 miles southwest of Utqiaġvik;

f.    **City of Kaktovik**, the eastern most village in the North Slope Borough;

g.    **City of Point Hope**, the second largest city on the North Slope where Iñupiat make up 89 percent of the population;

h.    **City of Utqiaġvik** (formerly known as the City of Barrow), the largest community on the North Slope, that serves as the economic, transportation, and administrative hub;

i.    **City of Wainwright**, the third largest city in the Borough, located along a wave-eroded coastal bluff on the east side of a narrow peninsula that separates Wainwright Inlet from the Chukchi Sea;

j.    **Ilisaġvik College**, the only tribal college in Alaska, providing quality post-secondary academic and vocational training in the northernmost point of Alaska;

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 9 of 68

k.  **Iñupiat Community of the Arctic Slope**, one of two regional federally recognized tribes in Alaska, serving the people of the eight communities of the North Slope—Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiaġvik, and Wainwright—through officials elected by the Iñupiat people of the North Slope;

l.  **Kaktovik Iñupiat Corporation**, the Alaska Native village corporation that owns approximately 92,000 acres of surface lands in the region;

m.  **Native Village of Atqasuk**, the long-established subsistence area located on the Meade River southwest of Utqiaġvik;

n.  **Native Village of Barrow**, the federally recognized tribe serving the largest community on the North Slope as the traditional Iñupiat government directly responsible to its tribal members;

o.  **Native Village of Kaktovik**, the federally recognized tribe located on Barter Island;

p.  **Native Village of Point Hope**, the federally recognized tribe serving as the traditional Iñupiaq government directly responsible to its tribal members in the westernmost village of the North Slope;

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 10 of 68

q.      **Native Village of Point Lay**, the federally recognized tribe located on the Chukchi Sea coast about 300 miles southwest of Utqiaġvik;

r.      **North Slope Borough**, America's northern-most municipal government and encompassing an area of nearly 95,000 square miles across northern Alaska and responsible for providing services for the eight villages of the North Slope—Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiaġvik, and Wainwright—under its home rule government authority;

s.      **North Slope Borough School District**, the school district responsible for providing education within each of the eight North Slope communities—Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiaġvik, and Wainwright—located at the "top of the world";

t.      **Nunamiut Corporation**, the Alaska Native village corporation that owns approximately 92,000 surface acres around the community of Anaktuvuk Pass and serves its Iñupiaq shareholders through an elected Board of Directors;

u.      **Olgoonik Corporation**, the Alaska Native village corporation serving the village of Wainwright and its more than 1,600 Iñupiaq shareholders through an elected Board of Directors;

v. **Tikiġaq Corporation**, the Alaska Native village corporation serving Point Hope and its approximately 1,400 Iñupiaq shareholders through an elected Board of Directors;

w. **Ukpeaġvik Iñupiat Corporation**, the Alaska Native village corporation serving Utqiaġvik and its approximately 3,800 Iñupiaq shareholders and numerous descendants through an elected Board of Directors.

18. Defendant Department of the Interior ("DOI") is an agency for the United States charged with overseeing public lands, including issuing the decisions appealed in this action.

19. Defendant Bureau of Land Management ("BLM") is an agency of the Department of the Interior.

20. Defendant Deb Haaland is Secretary of the Department of the Interior for the United States and is named as a defendant in that official capacity.

21. Defendant Steven Cohn is the Alaska State Director for the BLM and is named as a defendant in that official capacity.

## FACTS GIVING RISE TO THIS LAWSUIT

### A. Historical Background and Alaska's Three Key Land Management Statutes

22. The Iñupiat have continually inhabited the region of what is now known as the North Slope of Alaska for over 10,000 years. There are eight permanent Alaska Native

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 12 of 68

villages in the North Slope: Anaktuvuk Pass, Atqasuk, Kaktovik, Nuiqsut, Point Hope, Point Lay, Utqiaġvik, and Wainwright. The North Slope region is roughly the size of the state of Minnesota, yet its eight communities are not connected by a permanent road system, making the cost of living extremely high and access to economic opportunity generally low. The homelands of the North Slope Iñupiat coincidentally are also home to one of the largest hydrocarbon provinces in the world. Ensuring that the North Slope Iñupiat have a voice in the development of these resources on their ancestral homelands and receive their fair share of associated revenues has been a long-standing priority.

23.     A significant inflection point was statehood. Control over Alaska's lands and resources was the driving force behind statehood.[3] When Congress finally granted statehood in 1958, it recognized Alaska's economic potential and the need for Alaska's

---

[3] *E.g., Metlakatla Indian Community v. Egan*, 369 U.S. 45, 47 (1962); *Pullen v. Ulmer*, 923 P.2d 54, 57 n. 5 (Alaska 1996); *see also* Alaska Legislative Affairs Agency, Alaska's Constitution: A Citizen's Guide (4th ed. 2002) at http://w3.legis.state.ak.us/docs/pdf/citizens_guide.pdf (Many Alaskans concluded "that the notion of the federal government's superior vigilance as a trustee of the public interest was really a cloak for the institutional interests of bureaucrats and the economic interests of nonresident corporations exploiting those resources (principally Seattle and San Francisco salmon canning companies [])."); HOUSE COMM. ON INTERIOR AND INSULAR AFFAIRS, Act Providing for the Admission of the State of Alaska into the Union of 1957, H.R. REP. No 85-624 (1958) (The Statehood Act "will enable Alaska to achieve full equality with existing States, not only in a technical juridical sense, but in practical economic terms as well. It does this by making the new State master in fact of most of the natural resources within its boundaries . . . ."); Univ. of Alaska Anchorage, Institute for Social and Economic Research, Salmon Fish Traps in Alaska (1999) at 14 at http://www.iser.uaa.alaska.edu/publications/fishrep/fishtrap.pdf ("Alaska political entrepreneurs used the [fish] trap issue to rally the citizens of the territory around the quest for statehood.").

self-sufficiency. Consequently, as part of the Statehood Act, Alaska was given a land grant of over 103 million acres, including "mineral deposits," which were "subject to lease by the State as the State legislature may direct."[4]

24.     Among the lands the State selected were most of what is now Prudhoe Bay on the North Slope. The North Slope Iñupiat had no say as these lands were taken out from underneath them. In response to this and other land grabs, the North Slope Iñupiat formed the Arctic Slope Native Association ("ASNA") to help protect the indigenous lands of the Arctic Slope region. The discovery of significant oil reserves in Prudhoe Bay in the 1960s and the necessity to resolve aboriginal land claims before these resources could be fully developed, and a pipeline constructed, finally spurred Congressional action to address Native land rights.[5]

25.     In 1971 Congress extinguished Alaska Natives' longstanding claims to aboriginal title—claims that predated the Organic Act of 1884[6]—by conveying more than 44 million acres and $962.5 million to corporate entities established under the Alaska

---

[4] *Sturgeon v. Frost* (*Sturgeon I*), 577 U.S. 424, 428 (2016).

[5] *Sturgeon v. Frost* (*Sturgeon II*), 139 S. Ct. 1066, 1074 (2019).

[6] *E.g.*, *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 278 (1955) (discussing that the 1884 Organic Act did not grant Alaska Natives any "permanent rights in the lands of Alaska" and was intended "to retain the status quo until further congressional or judicial action was taken"); *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 141 S. Ct. 2434, 2438–39 (2021) ("[T]he claims of Alaska Natives to Alaskan land remained largely unsettled even following Alaska's admission to the Union as our 49th State in 1959.").

Native Claims Settlement Act ("ANCSA").[7]  ANCSA provided a novel approach to the aboriginal title issue.  In most of the United States, Indian Country is a complex patchwork of lands held in trust by the federal government for Indigenous peoples, state land, and land held in fee by tribes.  ANCSA conveyed lands in fee by establishing Regional Corporations and Village Corporations that are wholly owned by Alaska Native shareholders.[8]  Congress sought to implement the settlement "rapidly, with certainty, in conformity with the real economic and social needs" of Alaska Natives.[9]  This statement of purpose is the essence of the public policy underlying ANCSA.[10]

26.     ANCSA divided Alaska into twelve regions, "with each region composed as far as practicable of Natives having a common heritage and sharing common interests."[11]  The bounds of these regions define the geographic areas ("Regions") of the twelve Regional Corporations.  Within each Region are Alaska Native villages.  Many of these villages incorporated as for-profit Village Corporations under ANCSA.  Typically, Village Corporations own the surface estate of their lands and Regional Corporations

---

[7] 43 U.S.C. § 1601 *et seq.*; *Sturgeon I,* 577 U.S. at 430; *Alaska v. Native Vill. of Venetie*, 522 U.S. 520, 524 (1998).

[8] *Chugach Natives, Inc. v. Doyon, Ltd.*, 588 F.2d 723, 724 (9th Cir. 1979).

[9] 43 U.S.C. § 1601(b).

[10] *E.g., Yellen v. Confederated Tribes of the Chehalis Reservation*, 141 S. Ct. 2434, 2445 n.5 (2021); *Sturgeon I*, 577 U.S. at 430; *Akiachak Native Cmty. v. United States DOI*, 827 F.3d 100, 103 (D.C. Cir. 2016); *Oliver v. Sealaska Corp.*, 192 F.3d 1220, 1224 (9th Cir. 1999); *Hakala v. Atxam Corp.*, 753 P.2d 1144, 1147 (Alaska 1988); *Nenana Fuel Co. v. Native Vill. of Venetie*, 834 P.2d 1229, 1239 (Alaska 1992).

[11] 43 U.S.C. § 1606(a).

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 15 of 68

hold the subsurface estate.[12]  The corporate entities created by ANCSA have a fiduciary obligation to create value and turn a profit for their Alaska Native shareholders.  Further, the typical corporate charter or mission statement of the Regional and Village Corporations includes a statement of corporate purposes that is broader than mere economic profit, such as "[t]o engage in all activities, whether economic, cultural, social or charitable to protect and preserve the well-being of the Natives enrolled in the Arctic Slope Region . . . ."[13]

27.     The North Slope Iñupiat, while heavily involved in the process leading to the passage of ANCSA, opposed significant portions of what would become ANCSA because they did not provide sufficient protection or compensation for what had already been lost on the North Slope.  These concerns led to ASNA filing a petition to create the North Slope Borough ("NSB") to ensure that the Iñupiat were involved in any development on their ancestral homelands, so development was done *with* them through the NSB, not *to* them.  Creation of the NSB allowed for taxation of oil and gas infrastructure on the North Slope for the benefit of its people.  The North Slope Borough was incorporated in 1972, providing an important political engine for economic security for all North Slope residents.

28.     After passage/adoption of the Statehood Act and ANCSA, continuing

---

[12] *E.g.*, *Chugach Natives, Inc*., 588 F.2d at 724.

[13] *E.g.,* Article III of Restated Articles of Incorporation of Arctic Slope Regional Corporation.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 16 of 68

disputes over land use and allocation in Alaska eventually led to the passage of the Alaska National Interest Lands Conservation Act ("ANILCA"), which was intended to both "provid[e] sufficient protection for the national interest in the scenic, natural, cultural and environmental values on the public lands in Alaska" *and* "provid[e] adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people."[14]

29.     ANILCA set aside 104 million acres of lands in Alaska for preservation purposes, including the expansion of the Arctic National Wildlife Refuge and the creation of Gates of the Arctic National Park, both of which significantly impacted the ability of the North Slope Iñupiat to access and benefit from their ancestral land and continue engaging in subsistence activities.  ANILCA also expanded the NPR-A, but expressly did not place any NPR-A lands into conservation system units.  ANILCA, however, also contained a "no more" clause in Section 1326 prohibiting future land withdrawals without Congressional approval, thus making clear lands not already earmarked for conservation were available to satisfy ANILCA's goal of ensuring adequate economic opportunity.[15]

---

[14] *Sturgeon v. Frost* (*Sturgeon II*), 139 S. Ct. 1066, 1075 (2019).

[15]  16 U.S.C. § 3213 which provides:

(a) No future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska shall be effective except by compliance with this subsection. To the extent authorized by existing law, the President or the Secretary may withdraw

**B.**     **History and Purpose of the NPR-A**

30.     Extending from the northwest slope of the Brooks Range to the Arctic Coast, the NPR-A encompasses roughly 23 million acres of public land managed by the BLM and is the largest contiguous block of public lands in the country.  According to data from the U.S. Geological Survey, the NPR-A is estimated to hold 8.7 billion barrels of oil and 25 trillion cubic feet of natural gas.

31.     The NPR-A lies entirely within the North Slope Borough.  The villages of Nuiqsut, Atqasuk, Utqiaġvik, and Wainwright are also located entirely within the NPR-A and collectively they encompass over half of the residents of the North Slope Borough.  Management of the NPR-A also has significant impacts on neighboring villages Anaktuvuk Pass and Point Lay, which is why these villages are part of the NPR-A Working Group discussed below.

32.     The region's ANCSA Corporations also have a significant stake in NPR-A management.  ASRC is the ANCSA Regional Corporation for the North Slope, and it

---

public lands in the State of Alaska exceeding five thousand acres in the aggregate, which withdrawal shall not become effective until notice is provided in the Federal Register and to both Houses of Congress. Such withdrawal shall terminate unless Congress passes a joint resolution of approval within one year after the notice of such withdrawal has been submitted to Congress.

(b) No further studies of Federal lands in the State of Alaska for the single purpose of considering the establishment of a conservation system unit, national recreation area, national conservation area, or for related or similar purposes shall be conducted unless authorized by this Act or further Act of Congress.

owns the subsurface estate underlying approximately 250,000 acres of ANCSA Village Corporation lands and an additional 74,000 acres of surface/subsurface ownership within the NPR-A. ASRC also has over 180 miles of shared boundary with the NPR-A.

33. What is now known as the NPR-A was originally established by President Harding in 1923 as the Naval Petroleum Reserve No. 4 ("Pet 4") to provide an oil reserve for future use in national defense. In creating the reserve, President Harding noted that "the future supply of oil for the Navy is at all times a matter of national concern."[16] However, the oil embargo during the 1970s established that the Nation had a need for oil that exceeded the needs of the Navy. In response, Congress enacted the Naval Petroleum Reserves Production Act in 1976 ("NPRPA"), which redesignated Pet 4 as the "National Petroleum Reserve in Alaska," withdrew it from operation of the mining and mineral leasing laws, and transferred jurisdiction from the Navy to the Department of the Interior.[17]

34. The purpose of this newly-designated NPR-A was to increase domestic supplies of oil, and the NPRPA authorized the Secretary to begin consideration of development that would be "regulated in a manner consistent with the total energy needs

---

[16] *Northern Alaska Environmental Center v. Norton*, 361 F.Supp.2d 1069, 1072 (D. Alaska 2005).

[17] Naval Petroleum Reserves Production Act of 1976, Pub. L. No. 94-258, §§ 102-103, 90 Stat. 303 (1976) codified at 42 U.S.C. §§ 6501 *et seq.*

Case 3:24-cv-00136-SLG    Document 1    Filed 06/28/24    Page 19 of 68

of the Nation."[18]  The NPRPA authorized the Department of the Interior to continue the exploration efforts in the NPRA begun by the Navy,[19] and limited petroleum exploration in areas "designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value. . . ."[20]  In 1977 BLM promulgated regulations in response to the passage of the NPRPA whose purpose was to "provide procedures to explore the oil and gas production potential of" the NPR-A and "to ensure protection of the environmental and ecological values on the reserve during the required exploration program."[21]

35.    The NPRPA prohibited petroleum development and exploration until Congress enacted an appropriations bill in 1980 ("1980 Appropriations Bill") mandating "an expeditious program of competitive leasing of oil and gas" in the NPR-A,[22] and put in place provisions incentivizing the leasing of lands within the NPR-A suitable for oil and gas development.[23]  Congress further exempted the NPR-A from wilderness study requirements and the Federal Land Policy and Management Act of 1976 ("FLPMA")

---

[18] H.R. Rep. 94-81(I) at 1 (Mar. 18, 1975).

[19] *Id*. at § 104; 42 U.S.C. § 6504(b).

[20] 42 U.S.C. § 6504(a).

[21] 41 Fed. Reg. 40484 (Sept. 20, 1976).

[22] Department of Interior and Related Agencies Appropriations Act, Pub. L. No. 96-514, Title I, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C.§ 6508).

[23] 42 U.S.C. § 6506a; *see also N. Alaska Env't Ctr. v. Norton,* 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005).

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 20 of 68

requirements regarding resource management plans.[24] Congress also included provisions to encourage the greatest ultimate recovery of oil or gas on these lands.[25] Finally, Congress instructed BLM that 50 percent of all receipts from sales, rentals, bonuses, and royalties should be given to the State of Alaska to fund public services, with priority in allocation to the "subdivisions of the State most directly or severely impacted by development of oil and gas leased under this Act."[26] The result is a dominant-use statute, establishing the NPR-A's primary purpose as the expeditious production of oil to meet the Nation's energy needs.

36.     In response to these mandates, BLM promulgated regulations establishing the procedures for administering a competitive leasing program for oil and gas within the NPR-A.[27] BLM needed separate regulations to account for the fact that Congress instructed BLM to manage lands in the NPR-A differently from other BLM lands, such as those managed under FLPMA. As BLM explained: "This final rulemaking contains the procedures that will be followed in carrying out the Congressionally approved oil and gas leasing program for the National Petroleum Reserve–Alaska, a program that will

---

[24] 42 U.S.C. § 6506a(c) (exempting NPR-A from the wilderness study requirements of 42 U.S.C. § 1782 and from the land-use planning requirements of 42 U.S.C. § 1712). Congress added the exclusions from wilderness study and FLPMA planning because "the administrative requirements of these sections inhibit expeditious leasing." *See* H. Rep. No. 96-1147 at 33 (July 2, 1980).

[25] 42 U.S.C. § 6506a(k)(1)(A); *see generally Sovereign Inupiat for a Living Arctic et al v. BLM, et al.*, 516 F. Supp. 3d 943, 946 (D. Alaska Feb. 2, 2021).

[26] 42 U.S.C. § 6506a(l).

[27] 43 C.F.R part 3130.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 21 of 68

serve the national interest through the leasing and development of oil and gas resources that will reduce the dependence of the United States on foreign produced oil and gas."[28] The first lease sale in the NPR-A was held in 1982.

## C. BLM Management of the NPR-A

37. Until now, BLM has managed the NPR-A consistent with the above Congressional mandates, encouraging oil and gas leasing and exploration while balancing this with conservation and protection measures for certain environmentally sensitive areas. Because Congress exempted the Petroleum Reserve from certain FLMPA requirements, the NPRPA is a dominant-use statute and does not require consideration of sustained yield, multiple use, or the preparation of a resource management plan. Instead, BLM manages the NPR-A to "strike an appropriate balance" of promoting exploration, development, and production of oil and gas while protecting surface resources.[29]

38. BLM has historically administered oil and gas leasing and development through Integrated Activity Plans ("IAPs"). Development of IAPs is an iterative process, with extensive public engagement, consultation, and best available science backed by a comprehensive Environmental Impact Statement ("EIS") pursuant to the National Environmental Policy Act ("NEPA"), identifying what acreage in the NPR-A is available for oil and gas leasing, what acreage is subject to varying levels of environmental

[28] 46 FR 55494, 55497 (Nov. 9, 1981).

[29] 88 FR at 62026.

protection, and what acreage is subject to certain restrictions in terms of surface improvements and oil and gas exploration and production activities.

39.     In 1998, BLM issued an IAP opening 4.6 million acres, or 87 percent of the Northeast Planning Area of the NPR-A, to oil and gas leasing, while providing enhanced protections to various "Special Areas."  In the same time frame, BLM undertook a renewed leasing program in the Northwest Planning Area of the Reserve ("NWPA"), authorizing leasing in the entire NWPA.[30]

40.     In 2013, BLM issued the NPR-A 2013 Integrated Activity Plan (IAP), which made roughly half of the reserve available for oil and gas leasing but excluded specific areas with important surface values to protect critical ecological resources and provide certainty for industry.[31]  The 2013 IAP created the Peard Bay Special Area and expanded the Teshekpuk Lake and Utukok River Uplands Special Areas.[32]  The 2013 IAP included a full EIS.[33]  The 2013 IAP also created the NPR-A Working Group to ensure that NPR-A communities and stakeholders have a seat at the table and can ensure that BLM takes North Slope economics, subsistence concerns, and traditional knowledge

---

[30] *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 973-74 (9th Cir. 2006).

[31] 2013 IAP Record of Decision at 2-5.

[32] *Id*.

[33]     https://eplanning.blm.gov/public_projects/nepa/5251/41003/43153/Vol1_NPR-A_Final_IAP_FEIS.pdf

COMPLAINT
*Voice of the Arctic Iñupiat v. Bureau of Land Management*, *et al*. Case No. 3:24:cv_____

into account when making NPR-A management decisions.[34] BLM states that the function of the Working Group is to "discuss local concerns relevant to project development and implementation of BLM planning decisions with BLM."[35]

41.     In late 2020, BLM completed a revision to the NPR-A IAP, in response to former Interior Secretary Ryan Zinke's Secretarial Order of May 2017, directing the agency to strike "an appropriate statutory balance of promoting development while protecting surface resources."[36] The updated 2020 IAP, which then-Interior Secretary David Bernhardt affirmed in January 2021, opened 82 percent of the NPR-A—18.6 million acres—to oil and gas leasing, including eliminating the Colville River Special Area and making the entire Teshekpuk Lake Special Area available for leasing.[37] The 2020 IAP was developed in partnership with the North Slope Borough and in consultation with North Slope tribes and ANCSA Corporations. At the urging of these

[34] 2013 IAP Record of Decision at 1-2; 8-9.

[35] https://www.blm.gov/sites/blm.gov/files/Updated%20NPR-A%20WG%20Charter%20April%202017.pdf

[36] U.S. Department of the Interior Office of the Secretary, Subject: National Petroleum Reserve-Alaska, Secretarial Order no. 3352 (2017), https://www.doi.gov/sites/doi.gov/files/uploads/so-3352.pdf.

[37] Bureau of Land Management, "Final Environmental Impact Statement Errata" (U.S. Department of the Interior, 2020), 2, https://eplanning.blm.gov/public_projects/117408/200284263/20027832/250034034/Final%20Environmental%20Impact%20Statement%20Errata.pdf; Bureau of Land Management, "National Petroleum Reserve in Alaska: Integrated Activity Plan and Environmental Impact Statement, Vol. 1" (U.S. Department of the Interior, 2020), https://eplanning.blm.gov/public_projects/117408/200284263/20020342/250026546/Volume%201_ExecSummary_Ch1-3_References_Glossary.pdf.

local and Alaska Native stakeholders, the 2020 IAP included provisions that would have ensured further economic development opportunities for the region, allowed for community infrastructure needs to be considered in the NPR-A, and required that areas identified by local and Alaska Native entities be excluded from future leasing. The 2020 IAP likewise included a full EIS.

42.     The current administration did not retain the 2020 IAP, but nonetheless issued an IAP in 2022 dictating that "approximately 11.8 million acres (52 percent) of the NPR-A's subsurface estate are available for oil and gas leasing. The remaining approximately 11 million acres (48 percent) of the NPRA, including the majority of lands within Special Areas and much of the coastal area of the NPR-A along the Beaufort Sea, are closed to oil and gas leasing under this plan in order to protect and conserve important surface resources and uses in these areas."[38] In doing so the Secretary found, "by making these lands available for leasing, the decision adopted in this ROD fulfills BLM's responsibility under the NPRPA to manage NPR-A to conduct oil and gas leasing and development."[39] The 2022 IAP was essentially a reversion to the 2013 IAP and did not include a new EIS.

43.     Consistent with this management history, BLM issued leases in the NPR-A in the Bear Tooth Unit that are being developed as what is known as the "Willow

[38] 2022 IAP Record of Decision at 1.

[39] *Id*. at 9.

Project."  The Willow discovery was announced in 2017, and when completed, the multibillion-dollar development could produce in excess of 100,000 barrels of oil per day, create thousands of construction jobs and hundreds of permanent jobs, and contribute substantial revenue to federal, state, and local entities, most notably the North Slope Borough.  BLM has been consistently supportive of the Willow Project and most recently, in 2023, issued a Record of Decision and Supplemental Environmental Impact Statement reapproving the Willow Master Development Plan.  That approval is now the subject of ongoing litigation that is currently pending before the United States Court of Appeals for the Ninth Circuit.[40]

44.     Unfortunately, as set forth below, BLM has now reversed course and abandoned over forty years of careful balancing of oil and gas exploration and development with conservation in the NPRA-A, and instead has proposed and issued a rule that turns vast swaths of the NPR-A into a *de facto* conservation system unit, in defiance of Congress's express mandate for how the NPR-A should be managed.

D.     **The Proposed Rule and Flawed Public Engagement and Comment Process**

45.     What is now the Final NPR-A Rule was initially announced on September 6, 2023 and published in the Federal Register on September 8, 2023 (the "Proposed

---

[40] *E.g.*, *Sovereign Inupiat for a Living Arctic, at al. v. United States Bureau of Land Management, et al.*, Case No. 23-3627, District Court No. 3:23-cv-00058-SLG.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 26 of 68

Rule").[41]  The Proposed Rule included a 60-day comment period and a finding that the rule was "not economically significant."  The Proposed Rule sought to cut off access to millions of acres within the NPR-A, by treating 13.1 million acres of Special Areas in the NPR-A as *de facto* federal wilderness, and codifying in regulation an outright prohibition on any new leasing in 10.6 million acres, more than 40 percent of the NPR-A. The proposal also included significant barriers to new roads and other infrastructure in the NPR-A unless incredibly stringent criteria were met. The acreage closure combined with these new restrictions would effectively halt any and all future oil and gas development and development of local infrastructure in the NPR-A, converting an area Congress set aside for oil and gas development into a wilderness preserve, all by administrative fiat.

46.    While the Proposed Rule attracted more than 89,000 public comments, the public process was flawed from the start.  Most egregious has been the complete failure to interact and genuinely engage with the North Slope Iñupiat and their elected leaders and representatives.  Indeed, the North Slope Iñupiat were not consulted by federal officials prior to the Proposed Rule's announcement in September 2023 and only learned of the new restrictions through the media. Likewise, the NPR-A Working Group was not formally notified of the Proposed Rule until weeks after it was first published.  In fact, the NPR-A Working Group was never adequately engaged or consulted during the entire process, which is a sharp departure from BLM management since 2013 and antithetical to

---

[41] *Management and Protection of the National petroleum Reserve: Alaska* 88 Fed. Reg. 62025 (September 8, 2023).

the reason the Working Group was created. By excluding only affected/impacted Indigenous communities from the policymaking table, the BLM produced a deeply flawed rule that will impose dire economic consequences on all North Slope Iñupiat communities and jeopardize their culture.

47. As set forth below, local Indigenous elected leaders made every effort to highlight the negative repercussions of the Proposed Rule to DOI, appealing to the White House when stonewalled repeatedly by the Secretary of Interior. DOI Secretary Deb Haaland herself ignored or denied at least eight meeting requests from North Slope elected leaders, including denying a meeting during a multi-day trip to Alaska in October 2023. This lack of engagement is particularly egregious given the Biden Administration's repeated statements purporting to affirm its commitment to engage with tribal voices and support tribal sovereignty and tribal self-determination,[42] which are consistent with President Biden's campaign promise to "ensure tribes have a seat at the table at the highest level of the federal government and a voice throughout the government."[43]

---

[42] https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/15/fact-sheet-building-a-new-era-of-nation-to-nation-engagement/;
https://www.whitehouse.gov/briefing-room/statements-releases/2022/11/30/fact-sheet-biden-harris-administration-announces-new-actions-to-support-indian-country-and-native-communities-ahead-of-the-administrations-second-tribal-nations-summit/;
https://www.whitehouse.gov/briefing-room/statements-releases/2023/12/06/fact-sheet-president-biden-signs-historic-executive-order-to-usher-in-the-next-era-of-tribal-self-determination/

[43] https://www.whitehouse.gov/dpc/briefing-room/2021/11/15/usa-today-op-ed-building-a-new-era-of-engagement-between-tribal-nations-and-the-federal-government/

48.     Immediately after the Proposed Rule was announced, VOICE released a statement admonishing the BLM for its lack of proactive or meaningful engagement with the North Slope Iñupiat's elected leadership prior to publishing the proposed rule. ICAS, the North Slope Borough, and ASRC also released a statement sharing their concerns and frustration with the Administration's lack of consultation and engagement with the region's federally recognized tribe, ANCSA Corporations, and the North Slope Borough.

49.     Given the short 60-day comment period and that the Proposed Rule was announced at the beginning of many of the North Slope communities' fall whaling and subsistence hunting seasons, the North Slope communities, entities, and elected officials unanimously asked for a 90-day extension to the public comment period. They cited lack of time to fully understand impacts of the vague, sweeping Proposed Rule, emphasizing the lack of meaningful public engagement and formal consultation.  Other regions and entities throughout Alaska likewise wrote in support of a 90-day extension, including the Alaska Federation of Natives, NANA Regional Corporation, and the ANCSA Regional Association, all lamenting the lack of adequate stakeholder engagement and questioning BLM's efforts to implement such a sweeping rule in a short time frame.

50.     Unfortunately, BLM agreed on just two modest extensions, making clear its interest was speed, not proper public engagement.  On October 17, 2023, BLM announced a brief 10-day extension to the public comment period, pushing the deadline back to November 17.   Also on October 17, a BLM employee stated that evading the

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 29 of 68

Congressional Review Act was driving the timeline, not local and indigenous engagement as DOI so often claims. BLM then finally announced an additional 20-day extension on November 13, 2023, resulting in an overall compressed 90-day comment period that ended December 7, 2023.

51. BLM's reticence in granting any extensions and its insistence on plowing forward with this process during one of the key subsistence hunting, fishing, and whaling seasons on the North Slope made it difficult for local stakeholders to participate meaningfully in the process. As the President of the Village of Wainwright stated in his comments to the Proposed Rule:

> As an active member of Wainwright, former North Slope Borough assembly member and someone who has been actively involved and engaged in NPR-A issues for a very long time I am frustrated by the BLM's lack of empathy and understanding of our subsistence schedule after working so closely together over the last several decades. *The schedule of pushing this proposed Rule on our North Slope residents during our annual harvest and election cycle is extremely tone deaf.*[44]

52. Even worse, BLM announced the second minor additional extension only after extensive Congressional pressure was brought to bear. By early November, with the public comment deadline approaching and only two in-region meetings held by BLM, North Slope leadership made the decision to go to Washington, D.C. to better understand the public process, identify decision makers, and ensure that no decisions would be made without their input. The week of November 6, 2023, a North Slope Delegation comprised

---

[44] December 7, 2023 Comment Letter to BLM from John Hopson, Jr. President Village of Wainwright (emphasis added).

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 30 of 68

of VOICE, ICAS, the Borough, ASRC, Olgoonik Corporation, and the City of Anaktuvuk Pass leaders traveled over 3,000 miles to Washington, D.C.  The Delegation met with officials from the White House, including the Council for Environmental Quality's Chair, Office of Management and Budget's lone tribal advocate, and Intergovernmental Affairs Deputy Director. All three officials were surprised to hear that the Department of Interior was not meaningfully engaging with tribes and ANCs as they claim, and also pointing to them at the White House as the decision makers in the Proposed Rule process.

54.    During this trip, the North Slope Delegation was able to meet with the acting Deputy Secretary of the Interior solely because Alaska's United States Representative Mary Peltola requested the meeting.  Representative Peltola opened the meeting stating, "it should not take a member of Congress to set up a meeting."  Yet DOI did not substantively engage in this meeting either.  Rather, the acting Deputy Secretary stated that DOI was admittedly having "correspondence issues" then did not answer a single question from the North Slope Delegation.

54.    Soon thereafter, the North Slope Delegation and both Senators Murkowski and Sullivan hosted a press conference to publicly share concerns on the lack of meaningful engagement by the Administration on the Proposed Rule, emphasizing DOI Secretary Haaland's refusal to hear or engage with the unified voice of the North Slope Iñupiat.  That same day, Representative Peltola introduced H.R. 6285 Alaska's Right to

Produce Act of 2023, which would reverse the Proposed Rule and, the next day, Senators Murkowski and Sullivan introduced the Senate Companion S. 3289. It was only after the above events that DOI staff told various members of the North Slope Delegation that DOI was considering another short-term extension.

55.     During this artificially compressed time frame, BLM engaged in a very rushed, chaotic, and disorganized public meeting process. These meetings regarding the Proposed Rule were noticed at the last minute due to the condensed public comment timeframe, resulting in cancelled meetings, postponed meetings, and general confusion. Below are examples of this failed public process:

- **October 2, 2023** – BLM announced public meetings regarding the Proposed Rule for Anchorage on the 10th, Atqasuk on the 12th, and Nuiqsut on the 13th.
- **October 10, 2023** – BLM held an informational meeting in Anchorage where *no one from the crowd was allowed to speak*, comments were taken by notecard and DOI officials handpicked which comments to discuss and respond to.
- **October 10, 2023** – ICAS requested the public meeting in Atqasuk be rescheduled.
- **October 12, 2023** – BLM communicated to ICAS via email that they spoke with the Mayor of Atqasuk and the public meeting that was supposed to take place that day was now postponed at his request.
- **October 12, 2023** – BLM cancelled October 13 Nuiqsut public meeting due to weather.
- **October 13, 2023** – In advance of the Alaska Federation of Natives annual conference scheduled for October 19 – 21, 2023, *where Secretary Haaland was set to be a keynote speaker*, the North Slope trilateral regional leadership wrote Secretary Haaland a letter asking for a meeting regarding the Proposed Rule process and BLM's lack of meaningful engagement with the region's leadership.

- **October 17, 2023** – BLM announced an informational session in Washington, D.C. at DOI headquarters that same day, without notifying Alaska's Congressional Delegation. The informational session was cancelled hours later.
- **November 1, 2023** – BLM held its *first* in-region public meeting at Nuiqsut, almost two months after the release of the Proposed Rule and less than a week before their original public comment deadline.
- **November 2, 2023** – BLM held its *second* in-region public meeting at Utqiaġvik, almost two months after the release of the Proposed Rule and less than a week before the original public comment deadline.
- **November 3, 2023** – BLM cancelled a public meeting in Wainwright due to a death in the community.
- **November 12, 2023** – ASRC received an e-mail for the notice of consultation for the Proposed Rule that supposedly was sent by physical mail on August 25, 2023 to over 40 tribes and ANCSA Corporations. To this date, no North Slope entity has received the physical mail copy.
- **December 4, 2023** - BLM held its *third and final* in-region public meeting at Wainwright, almost three months after the release of the proposed rule and less than a week before the public comment deadline.

56.     BLM revealed the reason for this artificially rushed process during a working group meeting in October 2023, which was being recorded, when DOI Deputy Assistant Secretary for Land and Minerals Management stated on the record that the condensed timeframe for the comment period was intended to avoid the Congressional Review Act saying "[y]eah, I wish we could, we hardly ever give extensions that long on rulemaking. In other contexts, we might have that kind of time, but I'm happy to regale you with the ins and outs of the Congressional Review Act, but unfortunately, we're on a schedule with this one that we don't have any control over, so we just don't have that kind of time for this rule."

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 33 of 68

57.     The Final NPR-A Rule was announced by press release on April 19, 2024, and formally published in the Federal Register on May 7, 2024.[45]  It differs little in substance from the proposed rule.  The Final NPR-A Rule amends the regulations BLM established in 1977 in response to the passage of the NPRPA, yet it fails to address the 1981 regulations BLM passed in response to the 1980 Appropriations Act.

58.     The Final NPR-A Rule codifies existing new leasing prohibitions on 10.6 million acres, more than 40 percent of the NPR-A, as provided for in the 2022 NPR-A IAP.

59.     The Final NPR-A Rule also seeks to memorialize in regulation the maximum level of protection for over 13.1 million acres of previously designated Special Areas within the Reserve, limiting future oil and gas leasing and industrial development in the Teshekpuk Lake, Utukok Uplands, Colville River, Kasegaluk Lagoon, and Peard Bay Special Areas.  It does so by establishing a new "management priority" for Special Areas "to assure maximum protection of significant resource values, consistent with the requirements of the act for exploration and production of the Reserve."[46]  On "lands within Special Areas that are allocated as available for future oil and gas leasing or new infrastructure," the Final NPR-A Rule creates a presumption *against* development,

---

[45] *Management and Protection of the National Petroleum Reserve in Alaska*, 89 FR 38712 (May 7, 2024).  The new regulations are codified at 43 C.F.R. subpart 2361.
[46] 43 C.F.R. § 2361.40.

requiring BLM to "presume that proposed oil and gas activities should not be permitted unless specific information available to [BLM] clearly demonstrates that those activities can be conducted with no or minimal adverse effects on significant resource values or unless they are necessary to comport with the terms of a valid existing lease."[47]

60.     The Final NPR-A Rule further mandates that BLM "must protect surface resources by adopting whatever conditions, restrictions, and prohibitions it deems necessary or appropriate to mitigate reasonably foreseeable and significantly adverse effects of proposed oil and gas activities," and provides these conditions, restrictions, and prohibitions "may involve conditioning, delaying action on, or denying some or all aspects of proposed oil and gas activities . . . ."[48] It also requires that "[i]n assessing effects of a decision concerning proposed activity in the Reserve, the authorized officer will document consideration of any uncertainty concerning the nature, scope, and duration of potential effects on surface resources of the Reserve and shall ensure that any conditions, restrictions, or prohibitions on proposed oil and gas activities account for and reflect any such uncertainty."[49] "Uncertainty" is not defined.

61.     The Final NPR-A Rule further provides a process to propose and designate additional Special Areas off limits to development in the future, requiring BLM to conduct an evaluation at least once every ten years to determine if existing protections in

---

[47] *Id*. § 2361.40(f).

[48] *Id*. § 2361.10(a).

[49] *Id*. § 2361.10(b)(3).

the Special Areas are sufficient and whether to identify and designate new Special Areas.[50]  Any such decisions must be based "solely on the presence or absence of significant resource values" and cannot consider the "existence of measures that have been or may be adopted to protect or otherwise administer those values."[51]  Notably this new process is a one way ratchet that does not allow for the withdrawal or contraction of Special Areas.  In this way, BLM has essentially given itself unfettered discretion to expand, but *not reduce*, Special Areas without limitation.

62.     The Final NPR-A Rule establishes multiple new defined terms, most notably "significant resource value," which is "any surface value, including subsistence, recreational, fish and wildlife, historical, scenic, or other surface value that the Bureau identifies as significant and supports the designation of a Special Area."[52]  It also includes definitions that conflict with past regulations.  For example, "Special Areas" are now defined as "areas within the Reserve identified by the Secretary or by statute as having significant resource values and that are managed to assure maximum protection of such surface values, to the extent consistent with the requirements of the Act for the exploration and production of the Reserve," conflicting with the existing definition for "Special Areas" established at 43 C.F.R. § 3130.0-5(f).

63.     In announcing the Final NPR-A Rule, DOI stated that it was done in

---

[50] *Id*. § 2361.30.

[51] *Id*. § 2361.30(a)(4).

[52] 43 C.F.R. § 2361.5.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 36 of 68

conjunction with "President Biden's actions to protect millions of acres of lands and waters in the Arctic, including withdrawing approximately 2.8 million acres of the Beaufort Sea, ensuring the entire United States Arctic Ocean is off limits to new oil and gas leasing." Despite all these public pronouncements about how the Final NPR-A Rule will reduce development and increase environmental protection, BLM nonetheless maintains that the Final NPR-A Rule will not result in "significant impacts on the Nation's energy supply."[53]

64.　　In support of the Proposed and Final NPR-A Rule, DOI engaged in an economic analysis, reviewed by the Office of Management and Budget Office of Information and Regulatory Affairs ("OIRA"), and reached the conclusion there was no significant economic impact. Specifically, BLM stated in promulgating the Final NPR-A Rule that its "economic analysis concludes that most of the provisions of the final rule are editorial, administrative, or otherwise could have no quantifiable economic cost or benefit," and that "the annual effect on the economy of the regulatory changes will be less than $200 million and will not adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local or tribal governments or communities."[54]

65.　　BLM did not create a NEPA Environmental Impact Statement ("EIS"),

[53] *Management and Protection of the National Petroleum Reserve in Alaska*, 89 FR 38712 at 38755 (May 7, 2024).
[54] *Id.* at 38750.

COMPLAINT
*Voice of the Arctic Iñupiat v. Bureau of Land Management*, *et al.* Case No. 3:24:cv_____
Page 37 of 68

asserting that the Final NPR-A Rule is of an "administrative, financial, technical, or procedural nature" and thus was exempt from the need for an EIS under 43 CFR § 46.210(i). This conclusion is wholly unfounded and is inconsistent with over forty years of management where every other time there has been any change to BLM's NPR-A management, it has prepared an EIS with an accompanying public comment and consultation process.

66.    The Final NPR-A Rule also memorializes BLM's reticence to engage with the North Slope Iñupiat. The Final NPR-A Rule purports to value indigenous knowledge and defines Indigenous Knowledge as:

> [A] body of observations, oral and written knowledge, practices, and beliefs developed by Tribes and Indigenous Peoples through interaction and experience with the environment. It is applied to phenomena across biological, physical, social, and cultural systems. IK can be developed over millennia, continues to develop, and includes understanding based on evidence acquired through direct contact with the environment and long-term experiences, as well as extensive observations, lessons, and skills passed from generation to generation. IK is developed by Indigenous Peoples including, but not limited to, Tribal Nations, American Indians, and Alaska Natives.[55]

The problem here is not only that this definition is convoluted and vague, it allows any person to claim "indigenous" status and thus have knowledge BLM must consider, including those who have never been to, let alone lived on, the North Slope. This devalues the knowledge of the Indigenous People who *have* lived on the North Slope for thousands of years and continue to live there today. It also allows BLM to pick and

_____

[55] *Id.* at 38757.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 38 of 68

choose which "indigenous" voices it wishes to hear.

### F.  Unified and Bipartisan Opposition to the NPR-A Rule

67.     Broad bipartisan support for responsible resource development is the norm, not the exception, in Alaska.  This was evidenced by the unanimous support for the Willow Project in the NPR-A expressed by the Alaska Legislature, United States Senator Lisa Murkowski, United States Senator Dan Sullivan, and United States Representative Mary Peltola (collectively the "Alaska Congressional Delegation"). Opposition to the NPR-A Rule is similarly overwhelming and bipartisan.

68.     Alaska's Congressional Delegation has been unanimous in its opposition to the NPR-A Rule from its inception.  In October 2023 the Delegation requested an 80-day extension to the comment deadline for the proposed rule, citing DOI's lack of effective consultation with communities and stakeholders on the North Slope. The Delegation sent another letter shortly thereafter outlining deficiencies in the process, and another in April 2024, again urging DOI to withdraw its misguided and unlawful rule. All three members likewise spoke out against the NPR-A Rule when it was announced as final in April.

69.     The Alaska Legislature has also expressed its opposition to the NPR-A Rule.  On March 1, 2024 the Alaska House of Representatives passed a bipartisan resolution (HJR20) calling on DOI to withdraw the then-proposed rule.[56]  Speaking in favor of the resolution, Representative Thomas Baker of Kotzebue said BLM failed to

---

[56] https://www.akleg.gov/basis/Bill/Detail/33?Root=HJR%2020

adequately consult with tribal governments within and around the reserve about the rule's possible impacts: "The BLM is proposing a rule which would turn millions of acres into de facto wilderness, which would preclude any development, any subsistence activities . . . . It would preclude a lot of things which are integral to the State of Alaska and the people of my district, and, frankly, the people of all of Alaska."

70.     Finally, VOICE and its individual members are also unanimous in their objection to BLM's regulatory overreach.  For example, as noted, VOICE stated in April 2024 when the Final NPR-A Rule was announced: "[t]he federal government has again excluded the Indigenous North Slope Iñupiat from policymaking by issuing a final rule for the NPR-A that does not reflect our communities' wishes.  The Final NPR-A Rule will hurt the very residents the federal government purports to help by rolling back years of progress, impoverishing our communities, and imperiling our Iñupiaq culture."[57] VOICE's Board of Directors also issued a resolution condemning the DOI's failure to follow its own guidelines, as well as executive orders from President Biden himself, outlining the department's legal obligation to consult with federally recognized tribes and ANCSA Corporations on policies affecting their lands and people.  Notably, most of the member representatives on the VOICE Board of Directors are elected officials.  In other words, these individuals have been *chosen by the North Slope Iñupiat to represent them and speak for them.*

---

[57] https://voiceofthearcticinupiat.org/wp-content/uploads/2024/04/NPR-A-Press-Release-4.19.24.pdf.

71. Similarly, North Slope Borough Mayor Josiah Patkotak stated:

The DOI seems to believe that they care about this land more than we do. The elected leaders of the North Slope spoke in unison in opposition to this rule and the rulemaking process. To refuse to listen to our voices is to say that you know better - better than the people who have been this land's stewards for the past 10,000 years, and who depend on its continued health for their own survival. We deserve the same right to economic prosperity and essential services as the rest of this country and are being denied the opportunity to take care of our residents and community with this decision. It is insulting and, unfortunately, representative of the federal government's treatment of our Indigenous voices for decades.[58]

Likewise Arctic Slope Regional Corporation President and CEO Rex A. Rock, Sr. stated:

On multiple occasions, the elected leadership of the North Slope shared with administration officials our unified opposition to this rule. The Administration has chosen to ignore the consensus opinion of Indigenous organizations from our region. As stewards of the Arctic for millennia, the North Slope Iñupiat know our lands better than anyone else. Alongside our region's tribes, local governments, and Alaska Native Village Corporations, we will continue to fight to have our voices heard.[59]

72. In short, Alaska's Native leaders, elected federal and state representatives, a broad coalition of Alaskan economic, business, and labor organizations, and nearly every entity affected by oil and gas development on the North Slope, strongly object to BLM's unilateral attempt to convert the NPR-A into a preserve and overturn the Congressional mandate, set forth in the NPRPA, which calls for an "expeditious program" for the responsible development of the NPR-A.

---

[58] https://voiceofthearcticinupiat.org/wp-content/uploads/2024/04/NPR-A-Press-Release-4.19.24.pdf.

[59] *Id.*

### G. Reasons Why the Final NPR-A Rule Is Legally Flawed, Procedurally Flawed, and Arbitrary and Capricious

####    1. The Final NPR-A Rule Upends the Congressionally Mandated Balance Between Conservation and Development Set Forth in the Statehood Act, ANCSA, and ANILCA

73.     As set forth above, the Statehood Act, ANCSA, and ANILCA provide the framework for resource development and conservation in Alaska. Through these landmark statutes, Congress made clear that it expected that certain lands would be managed to generate economic opportunities and revenue to support Alaska's socio-economic well-being, while development would be precluded on other lands to protect vital ecological and cultural values.[60] The Final NPR-A Rule here upsets the balance these statutes strike between resource development, environmental protection, and furthering subsistence uses and Alaska Native self-determination.

74.     Indeed, as also noted above, ANILCA also contained a "no more" clause in Section 1326 prohibiting future land withdrawals without Congressional approval, thus making clear that lands not already earmarked for conservation were available to satisfy ANILCA's goal of ensuring economic opportunity.[61] Congress also made clear in passing

---

[60] *E.g., Sturgeon II*, 139 S. Ct. at 1075-1076 (discussing the balance in ANILCA between "sufficient protection for the national interest in the scenic, natural, cultural and environmental values" and "adequate opportunity for satisfaction of the economic and social needs of the State of Alaska and its people"); *see also* A. Sears, A. Lindholm & P. Christian, *ANILCA: A Perspective from Boots on the Ground,* 21(1) Alaska Park Science 34, 35 (2022) http://npshistory.com/newsletters/alaska-park-science/v21n1.pdf (noting that 148 million acres of federal acreage in Alaska is designated for conservation).

[61] 16 U.S.C. § 3213 which provides:

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 42 of 68

ANILCA that:

> [T]he designation and disposition of the public lands in Alaska pursuant to this Act are found to represent a proper balance between the reservation of national conservation system units and those public lands necessary and appropriate for more intensive use and disposition, and thus Congress believes that the need for future legislation designating new conservation system units, new national conservation areas, or new national recreation areas, has been obviated thereby.[62]

Converting large swaths of the NPR-A into conservation system units by giving BLM discretion to expand and create new "Special Areas" where there is a presumption against oil and gas activities directly violates these provisions of ANILCA.

75. BLM's unilateral effort to throttle further development in the NPR-A also runs directly contrary to Congress's repeated recognition of the national security

---

(a) No future executive branch action which withdraws more than five thousand acres, in the aggregate, of public lands within the State of Alaska shall be effective except by compliance with this subsection. To the extent authorized by existing law, the President or the Secretary may withdraw public lands in the State of Alaska exceeding five thousand acres in the aggregate, which withdrawal shall not become effective until notice is provided in the Federal Register and to both Houses of Congress. Such withdrawal shall terminate unless Congress passes a joint resolution of approval within one year after the notice of such withdrawal has been submitted to Congress.

(b) No further studies of Federal lands in the State of Alaska for the single purpose of considering the establishment of a conservation system unit, national recreation area, national conservation area, or for related or similar purposes shall be conducted unless authorized by this Act or further Act of Congress.

[62] 16 U.S.C. § 3101(d).

imperative to ensure responsible domestic oil and gas development on public lands.[63]

Ensuring affordable energy has influenced U.S. energy, national security, and economic

policy for decades.[64]  For Alaska's North Slope, Congress determined in the Trans-

Alaska Pipeline Authorization Act of 1973 that the national interest is advanced by

bringing North Slope oil to market.[65]  Specifically, Congress declared "that the crude oil

---

[63] *E.g. California Co. v. Udall*, 296 F.2d 384, 388 (D.C. Cir. 1961) ("The public does not benefit from resources that remain undeveloped, and the Secretary must administer the [Mineral Leasing Act] so as to provide some incentive for development."); *see also* Outer Continental Shelf Lands Act, 43 U.S.C. § 1332(3) ("the outer Continental Shelf is a vital national resource reserve held by the Federal Government for the public, which should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs").

[64] *E.g.,* Energy Policy and Conservation Act, 42 U.S.C. § 6231(a) ("The Congress finds that the storage of substantial quantities of petroleum products will diminish the vulnerability of the United States to the effects of a severe energy supply interruption, and provide limited protection from the short-term consequences of interruptions in supplies of petroleum products."); Energy Policy Act of 2005, Pub. L. No. 109-58, § 961, 119 Stat. 594, 889 (2005) ("The Secretary shall carry out research, development, demonstration, and commercial application programs in fossil energy, including activities under this subtitle, with the goal of improving the efficiency, effectiveness, and environmental performance of fossil energy production, upgrading, conversion, and consumption. Such programs take into consideration the following objectives . . . . (4) Decreasing the dependence of the United States on foreign energy supplies. (5) Improving United States energy security."); Energy Independence and Security Act of 2007, Pub. L. No. 110-140, preamble., 121 Stat. 1492, 1492 (2007) (providing that the purpose of the Act is "[t]o move the United States toward greater energy independence and security").

[65] 43 U.S.C. § 1652(a) ("The purpose of this chapter is to insure that, because of the extensive governmental studies already made of this project and the national interest in early delivery of North Slope oil to domestic markets, the trans-Alaska oil pipeline be constructed promptly without further administrative or judicial delay or impediment. To accomplish this purpose it is the intent of the Congress to exercise its constitutional

on the North Slope of Alaska is an important part of the Nation's oil resources, and that the benefits of such crude oil should be equitably shared, directly or indirectly, by all regions of the country."[66]  As noted above, the NPRPA and 1980 Appropriations Act were passed in response to a past energy crisis.  As Senator Ted Stevens explained at the time, "we can no longer delay efforts which would increase the domestic supply of oil and lessen our reliance on imports."[67]  The Final NPR-A Rule thus runs contrary to not only ANILCA, but years of long-standing Congressional policy toward oil and gas development on the North Slope, including the NPRPA, as described below.

2.  The Final NPR-A Rule Is Directly Contrary to the NPRPA and the 1980 Appropriations Act

76.  The NPR-A was explicitly created as a reserve to hold petroleum for future use and, in 1980, Congress mandated "an expeditious program of competitive leasing of oil and gas" in the NPR-A,[68] and put in place provisions incentivizing the leasing of lands within the NPR-A suitable for oil and gas development.[69]  The Final NPR-A Rule turns the intent and purpose of the NPRPA and the 1980 Appropriations Act on their heads. It changes BLM's primary management objective for the NPR-A from increasing domestic

powers to the fullest extent in the authorizations and directions herein made and in limiting judicial review of the actions taken pursuant thereto.").

[66] Pub. L. 93–153, Title IV, §410, Nov. 16, 1973, 87 Stat. 594.

[67] 126 Cong. Rec. S29489 (1980) (statement of Sen. Stevens).

[68] Department of Interior and Related Agencies Appropriations Act, Pub. L. No. 96-514, Title I, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C.§ 6508).

[69] 42 U.S.C. § 6506a; *see generally N. Alaska Env't Ctr. v. Norton,* 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005).

oil supply to providing maximum protection for Special Areas and effectively blocking further oil and gas development within large swaths of the NPR-A.

77.     BLM cannot unilaterally disregard the purpose of the NPR-A and Congressional direction to manage it primarily for oil and gas development and instead manage it as a *de facto* wilderness preserve.  For example, in the 2022 IAP, BLM recommended removing the Colville River Special Area because the data no longer supported the location of the protected resource.  It also identified that the raptor nesting data did not match the Special Area and proposed to remove it and to protect these resources through IAP stipulations, which protect resources and habitat regardless of location. Yet the in promulgating the Final NPR-A Rule, BLM reversed course with no explanation or justification. It not only proposes keeping the Colville River Special Area but *increasing* its level of protection.

78.     As also discussed above, Congress exempted the NPR-A from FLPMA's requirements regarding resource management plans and wilderness study.[70] BLM has historically affirmed the unique requirements that apply to its management of the NPR-A and, as recently as the 2022 IAP, stated "[b]ecause of the exemption from FLPMA Section 202 and that the NPR-A is a dominant-use statute, the IAP is not developed as a resource management plan and does not consider sustained yield and multiple use." Yet the Final NPR-A Rule improperly imports these precise management concepts from

---

[70] 42 U.S.C. § 6506a(c).

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 46 of 68

FLPMA under the guise of providing "maximum protection" for Special Areas. For example, the Final NPR-A Rule allows BLM to implement interim measures against oil and gas activities in *proposed* Special Areas before they are finalized, essentially mirroring FLPMA's wilderness study provisions.

79. BLM has also created an impermissible presumption against leasing and new infrastructure in Special Areas. The Final NPR-A Rule states that "[o]n lands allocated as available for future oil and gas leasing or new infrastructure the BLM will presume that proposed oil and gas activities should not be permitted unless it can be clearly demonstrated that those activities can be conducted with no or minimal adverse effects on significant resource values, or unless they are necessary to comport with the terms of a valid existing lease."[71] This presumption is directly contrary to the text and purpose of the NPRPA, which clearly indicates that any presumption should cut *in favor* of oil and gas leasing and development, even in Special Areas, so long as sufficient protections and safeguards are enacted.

80. Further, BLM's reliance on the phrase "maximum protection" in the NPRPA ignores its context in the statute, which provides that exploration within Special Areas shall be conducted for "maximum protection of such surface values *to the extent consistent with the requirements of this Act for the exploration of the Reserve*."[72] Thus,

---

[71] Management and Protection of the National Petroleum Reserve in Alaska, 89 FR 38712 at 38746 (May 7, 2024).

[72] 42 U.S.C. § 6504(a) which provides in relevant part (emphasis added):

COMPLAINT
*Voice of the Arctic Iñupiat v. Bureau of Land Management, et al.* Case No. 3:24-cv_____

the goal of "maximum protection" remains subservient to the primary purpose of the NPR-A, which is the encouragement of oil and gas leasing for the benefit of the Nation's energy supply. As Congress explained, "'maximum protection of such surface values' *is not a prohibition on exploration-related activities within such areas*, it is intended that such exploration operations will be conducted in a manner that will minimize the adverse impact on the environment."[73] BLM's justifications for the Final NPR-A Rule elevates "maximum protection" to a separate and independent goal of the NPRPA, an interpretation of the statue that does not withstand any level of scrutiny. Contrast this statutory language with that of ANILCA, quoted above, which *is* a dual-purpose statute with conservation and economic development as coequal goals.

81. BLM's reinterpretation of how the phrase "maximum protection" applies to its management of the NPR-A is a departure from its longstanding interpretation and practice that "maximum protection" is not in opposition to oil and gas leasing and production. All of its past IAPs for the NPR-A, including the 2022 IAP, consistently allowed leasing, exploration, production, and development in designated Special Areas (the only areas where "maximum protection" applies).

---

Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary ... shall be conducted in a manner which will assure the maximum protection of such surface values *to the extent consistent with the requirements of this Act for the exploration of the reserve*.

[73] H.R. Conf. Rep. 94-942 at 21 (emphasis added).

82.     BLM's consistent past interpretation of how the phrase "maximum protection" applies has been repeatedly affirmed in federal court.  Most recently, the Federal District Court for the District of Alaska rejected the argument that production and development should be restricted in the Teshekpuk Lake Special Area (TLSA):

> Although Congress directed 'maximum protection' be accorded to significant surface values in the TLSA and other Special Areas while undertaking oil and gas activities in the NPR-A, *it is still clearly envisioned that the TLSA would be developed for oil and gas production*.[74]

Similarly in 2006, in another case challenging leasing within Special Areas of the NPR-A, the District Court made clear maximum protection was not meant to preclude oil and gas leasing and exploitation:

> The test is, as Intervenors argue, one of relativity; the degree of protection must be consistent with NPRPA. One of the stated objectives of NPRPA is the expeditious program of competitive leasing of oil and gas in the Reserve.  42 U.S.C. § 6506a(a).  *Thus, the Secretary must necessarily balance the leasing of the lands in TLSA with the protection of the environment*.[75]

Put simply, until now, BLM has always believed that the phrase "maximum protection" does not discourage oil and gas leasing and its departure from this interpretation runs contrary to the statute and prior court decisions interpreting it.

83.     In summary, the Final NPR-A Rule stands in direct defiance of

---

[74] *Center for Biological Diversity v. Bureau of Land Management,* Case No. 3:23-cv-00061 SLG, p.20 (D. Alaska Nov. 9, 2023) (emphasis added).

[75] *Nat'l Audubon Soc'y v. Kempthorne,* No. 1:05-CV-00008-JKS, 2006 WL 8438583, at *15 (D. Alaska Sept. 25, 2006) (emphasis added).

Congress's stated purpose for creating the NPR-A and is directly contrary to how Congress has instructed BLM to manage the Reserve. Unlike statutes like ANILCA that have a dual purpose, the NPR-A is a dominant purpose statute designed *only* to provide for oil and gas development in the NPR-A to increase the nation's domestic energy supply. There is no credible argument that Congress gave BLM the discretion to turn more than 13 million acres of the NPR-A into an undevelopable wilderness and the further discretion to stymie development in large swaths of the Reserve. Indeed, the NPRPA expressly prohibited BLM from setting aside *any* NPR-A lands as wilderness.[76] The Final NPR-A Rule thus exceed BLM's authority and conflicts "with the statutory language and past practice under the statute."[77]

        3.    <u>The Final NPR-A Rule Violates NEPA Because BLM Did not Conduct an EIS or an EA.</u>

84.    As set forth above, BLM did not perform a NEPA EIS, asserting that the Final NPR-A Rule is of an "administrative, financial, technical, or procedural nature" and thus was exempt from the need for an EIS under 43 CFR § 46.210(i). This conclusion is wholly unfounded and is inconsistent with over forty years of management during which every other time there has been a change to BLM's NPR-A management, it has prepared an EIS with an accompanying public comment and consultation process.

85.    43 CFR § 46.210(i) provides that "unless any of the extraordinary

---

[76] 43 U.S.C. 6506a(c).

[77] *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023).

circumstances in section 46.215 apply" the following actions are excluded from EIS requirements:

> Policies, directives, regulations, and guidelines: that are of an administrative financial, legal, technical, or procedural nature; or whose environmental effects are too broad, speculative, or conjectural to lend themselves to meaningful analysis and will later be subject to the NEPA process, either collectively or case-by-case.

Here, the Final NPR-A Rule contains no explanation of why it meets these criteria.

86.    Further, BLM is simply wrong to assert that the Final NPR-A Rule is purely administrative, technical, and procedural. To the contrary, it is a substantive sea change in how BLM manages the NPR-A and the Administration's statements touting the Final NPR-A Rule make this abundantly clear.

87.    Finally, BLM is wrong in concluding the extraordinary circumstances in Section 46.215 do not apply to the Final NPR-A Rule. For example, these "special circumstances" include "significant impacts on public health or safety" and "having a disproportionately high and adverse effect on low income or minority populations." As discussed throughout this Complaint, the Final NPR-A Rule has significant negative public health impacts and significant adverse impacts on the North Slope Iñupiat.

### 4.    The Final NPR-A Rule Is Based on a Flawed Economic Analysis

88.    As discussed above, BLM concluded that there was no significant economic impact associated with the Final NPR-A Rule, in a transparent effort to avoid the Final NPR-A Rule qualifying as a significant regulatory action defined by Executive

Case 3:24-cv-00136-SLG    Document 1    Filed 06/28/24    Page 51 of 68

Order 12866, as amended by Executive Order 14094.[78]  On its face, the Final NPR-A

Rule's presumption that no additional leasing, development, and/or infrastructure within

Special Areas will be allowed, paired with the proposed discretion of the Authorized

Officer to establish interim/emergency protections on lands considered for Special Areas,

is a significant regulatory action.  Indeed, of the four developments (proposed and

constructed) within the boundary of the NPR-A, all four are within or near Special Areas.

89.    BLM's analysis failed to account for the impact to the communities in and

around the NPR-A and their ability to provide services to their constituents. Nor did it

properly account for the negative impacts of loss of economic opportunity to North Slope

residents.  As noted above, the North Slope Borough was created to ensure that the local

people would benefit and be provided services from the oil and gas industry through the

ability to tax industry. For example, in 2021 the Borough received approximately $375.3

million in revenue from oil and gas property taxes, accounting for 95 percent of the total

property taxes collected that year.  The same was true in 2022 where the Borough

---

[78] Executive Order 14094 defined a "significant regulatory action" to mean any regulatory action that is likely to result in a rulemaking that may: (1) have an annual effect of the economy of $200 million or more; or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or tribal governments or communities; (2) create a serious inconsistency or otherwise interfere with an action taken or planned by another agency; (3) materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or (4) raise legal or policy issues for which centralized review would meaningfully further the President's priorities or the principles set forth in this Executive order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.  88 FR 21879, April 11, 2023.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 52 of 68

received $376.9 million in oil and gas property taxes. Again, these revenues enable the Borough to provide a wide range of essential public services. If large swaths of NPR-A are placed off limits to future oil and gas production, these revenue streams will inevitably decline, and essential public services, like piped water and sewer, as well as wildlife management and research, will become unaffordable in the years ahead.

90.     Development in the NPR-A also provides revenue to affected local communities and the Borough through the NPR-A Impact Mitigation Fund and other benefits. The NPRPA requires that 50 percent of all sales, rentals, bonuses, and royalties on leases issued in the NPR-A are paid to the State of Alaska, which then distributes those proceeds primarily to the North Slope communities through a long-established grant program. Since 1999, nearly $250,000,000 has been distributed to North Slope communities through this program. When more production comes online from the Willow Project, starting in 2029, about $80 to $120 million more is expected to be available for distribution annually.[79] As North Slope oil fields age, it is critical that new development will continue to replace lost revenue. The Final NPR-A Rule throws a wrench into this process.

91.     The Final NPR-A Rule also further isolates the four villages surrounded by the NPR-A, Nuiqsut, Atqasuk, Utqiaġvik, and Wainwright. These villages have no permanent road connections and effectively ending further economic activity in the NPR-

---

[79] Willow Master Development Plan, Supplemental Environmental Impact Statement, vol. 1, pg. 296, January 2023.

A would further deny them the opportunity to benefit from the infrastructure (roads, communication lines, etc.) that oil and gas development provide. Finally, the oil and gas industry itself is also a valuable source of local employment on the North Slope; more than one-third of jobs held by Borough residents are directly or indirectly supported by the oil and gas industry. These jobs are extremely important in a region that suffers from limited employment opportunities and high living costs in this remote region. BLM's economic analysis disregards all of this. Thwarting further economic development on the North Slope denies its residents economic opportunity and deprives local governments, tribes, and other entities of the ability to provide basic infrastructure and services to residents into the future. History demonstrates that economic opportunity and development will improve the health and overall well-being of North Slope Alaska residents.[80] Further, BLM did not analyze of these socio-economic impacts under an EA or EIS under NEPA. For all these reasons, BLM was wrong to conclude that there is no significant economic impact associated with the conversion of large portions of the NPR-A into a *de facto* preserve.

---

[80] For example, a 2017 study published in the Journal of the American Medical Association demonstrated that compared to the national average, Alaska's North Slope and Northwest Arctic Borough experienced substantial increases in life expectancy between 1980 and 2014— increases of 8–14 years of life. This is significant because oil production on the North Slope began in 1979 and this study helps confirm the health and prosperity that comes from responsible resource development. Dwyer-Lindgren L, Bertozzi-Villa A, Stubbs RW, et al*., Inequalities in Life Expectancy Among US Counties, 1980 to 2014: Temporal Trends and Key Drivers.* JAMA INTERN. MED. 1003 (2017) https://jamanetwork.com /journals/jamainternalmedicine/article-abstract/2626194?cmp=1&appId=scweb.

5.   The Final NPR-A Rule Does Not Appropriately Consider Subsistence Impacts Under Section 810 of ANILCA

92.   Title VIII, Section 810 of ANILCA requires federal agencies with jurisdiction over lands in Alaska to evaluate the potential impacts of proposed actions on subsistence uses and needs.[81] A Section 810 Evaluation is required for any action to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands in Alaska.

93.   Procedurally, Section 810 requires up to four steps of agency analysis and

---

[81] Section 810 is codified at 16 U.S.C. § 3120(a), which states:

In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands ... the head of the federal agency ... over such lands ... shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes. No such withdrawal, reservation, lease, permit, or other use, occupancy or disposition of such lands which would significantly restrict subsistence uses shall be effected until the head of such Federal agency –

(1) gives notice to the appropriate State agency and the appropriate local committees and regional councils established pursuant to section 805;

(2) gives notice of, and holds, a hearing in the vicinity of the area involved; and

(3) determines that (A) such a significant restriction of subsistence uses is necessary, consistent with sound management principles for the utilization of the public lands, (B) the proposed activity will involve the minimal amount of public lands necessary to accomplish the purposes of such use, occupancy, or other disposition, and (C) reasonable steps will be taken to minimize adverse impacts upon subsistence uses and resources resulting from such actions.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 55 of 68

action:

- A three-part evaluation analyzing: (1) the effect of the proposed action on subsistence uses and needs; (2) the availability of other lands for the purposes sought to be achieved; and (3) other alternatives that would reduce or eliminate the proposed action from lands needed for subsistence purposes;

- A finding of whether a proposed action may have significant restriction on subsistence uses;

- If there is a significant impact on subsistence uses, a notice and hearing; and

- A three-part determination by the agency before the proposed action is authorized.

94.     In the Final NPR-A Rule, BLM attempts to defend its assault on the well-being of the residents of the North Slope by claiming it is furthering subsistence as provided for in ANILCA Section 810 and, therefore, there is no significant restriction on subsistence uses.  BLM stated "[i]n protecting surface resources, the rule ensures that key wildlife habitat remains healthy, thereby safeguarding subsistence resources throughout the NPR-A and supporting the Alaska Native communities who rely on the land, water, and wildlife to continue their way of life."  But the opposite is true. ANILCA struck a careful balance between subsistence uses and resource development partly because *economic opportunity furthers subsistence opportunities*.  For example, in the ongoing litigation regarding the Willow Project in the NPR-A, Kuukpik Corporation (the ANCSA

Village Corporation for Nuiqsut, the village closest to the Willow site) submitted a sixteen-point list of subsistence benefits from the project.[82]   Likewise, the NPR-A Working Group in a resolution calling for a full NEPA EIS analysis of the Final NPR-A Rule stated "the local North Slope economy and subsistence resources are not mutually exclusive."[83]

95.    Here, numerous North Slope regional and local entities filed comments opposing the Proposed Rule including VOICE members ICAS, the North Slope Borough, ASRC, City of Atqasuk, City of Utqiaġvik, and the City of Wainwright.   Notably absent from these comments of local stakeholders was any sentiment that the Proposed Rule would benefit subsistence activities.   To the extent local leaders addressed subsistence in comments, it was in opposition to the Rule.   Indeed, the NPR-A Working Group resolution calling for a NEPA EIS analysis did so in part because "BLM failed to study, analyze, and evaluate the effect of the proposed rule on subsistence resources, positively or negatively and "did not incorporate local, traditional ecological knowledge into its analysis of the proposed rules' effects in subsistence resources."[84]

96.    Likewise, Kuukpik Corporation expressed concern the Proposed Rule would

---

[82]  Kuukpik's Combined Brief in Opposition to Plaintiffs' Motions for Summary Judgment at 12-13, 18, *Sovereign Iñupiat for a Living Arctic, et al. v. BLM, et al.* (No. 3:23-cv-00058-SLG), Doc. 144.

[83] Resolution 2023-01 of NPR-A Working Group dated February 6, 2024.

[84] *Id.*

COMPLAINT
*Voice of the Arctic Iñupiat v. Bureau of Land Management*, *et al.* Case No. 3:24-cv_____

allow BLM to prohibit access in the NPR-A or its Special Areas for subsistence purposes.[85] The Final NPR-A Rule provides little comfort in this regard as it simply provides that "BLM will provide reasonable access to and within Special Areas for subsistence purposes." "Reasonable access" is undefined, and it is inherently problematic to leave subsistence access on lands the Iñupiat have used for thousands of years solely at the discretion of an outside governmental entity.

97.    Likewise, while the Final NPR-A Rule exempts subsistence infrastructure from its strict rules on surface infrastructure in Special Areas, BLM ignores both that it still retains significant discretion to deny or impede this infrastructure under the guise of ensuring "maximum protection," and that without tax revenue and economic opportunity, subsistence infrastructure (snowmachines, boats, hunting equipment, etc.) becomes unaffordable, essentially rendering the entire issue moot.   Further, oil and gas infrastructure has been used historically on the North Slope to *increase* subsistence access.  For example, the road running through the greater Mooses Tooth #2 Unit in the Northeast NPR-A is a very popular and highly used caribou hunting location.  Prohibiting new development in the NPR-A thus prohibits opportunities for increased subsistence access.

98.    The North Slope Borough includes a Department of Wildlife Management whose mission is to "facilitate[] sustainable harvest, and monitor[] populations of fish

---

[85] Kuukpik Comment Letter dated December 7, 2023.

and wildlife species through scientific research, Indigenous knowledge, leadership, and advocacy," and whose responsibility is to "assure participation by Borough residents in the management of wildlife and fish by maintaining these resources at healthy population levels so that residents can continue to practice traditional methods of subsistence harvest of wildlife in perpetuity"[86]   Borough funding from oil and gas activities therefore also has a positive impact on *local* management of subsistence resources.

99.    In short, BLM's subsistence analysis and conclusion that there is no significant restriction on subsistence uses was wholly one-sided without consideration given to how the actual residents of the North Slope feel about the relationship between oil and gas development and subsistence and, more importantly, how removing economic opportunity *negatively impacts* subsistence activities.  As a result, the Final NPR-A Rule is contrary to ANILCA's subsistence requirements in Section 810 because BLM should have concluded that the Final NPR-A Rule *does* constitute a significant restriction on subsistence uses.

6.    The Final NPR-A Rule Is an Unprecedented Arbitrary and Capricious Departure from How BLM Has Managed the NPR-A Since Its Inception

100.    As set forth above, until proposing and issuing the Final NPR-A Rule, BLM managed the NPR-A consistent with the Congressional mandate of the NPRPA and the 1980 Appropriations Act to implement "an expeditious program of competitive

---

[86] https://www.north-slope.org/departments/wildlife-management/

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 59 of 68

leasing of oil and gas" in the NPR-A. BLM's leasing program regulations in place since 1981,[87] are designed to facilitate the Congressional purpose of carrying out an expedited program of leasing, development and production, while achieving the Congressionally desired "balance" between development and protection of environmental values.[88] BLM has arbitrarily and without sufficient explanation reversed course and concluded the NPR-A should be managed as a *de facto* wilderness area where oil and gas leasing and development should be discouraged.

101. Further, the Final NPR-A Rule overrides years of past practice where, since at least 1998, BLM has used the IAP process to determine which NPR-A lands to lease and the appropriate best management practices, stipulations, and conditions to apply to oil and gas activities. BLM has now discarded the IAP process and all the meaningful stakeholder engagement that accompanies it in favor of a unilateral draconian regulatory process designed to give BLM broad discretion to prevent further development within the NPR-A. For example, many of the existing leases in the NPR-A, including the over 80 leases in Special Areas, are located in areas that the 2022 IAP designated as "open" to oil and gas leasing and "available for new infrastructure." But the Final NPR-A Rule capriciously reverses course, determining that all Special Areas, including those that are "open" to oil and gas development under the 2022 IAP, have a presumption *against that*

---

[87] 43 C.F.R. part 3130.

[88] 46 Fed. Reg. at 37725.

*same development*. BLM has not acknowledged, let alone explained, these radical departures from past management.

7. <u>The Final NPR-A Rule Is the Result of a Flawed Process with a Complete Lack of Meaningful Engagement with Any of the North Slope Region's Elected Leaders, Tribes, ANCSA Corporations, Local Governments, and Residents.</u>

102. As set forth above, BLM issued the Proposed Rule on an expedited schedule with an admitted intent to avoid the Congressional Review Act. As a result, the public comment period was artificially truncated, and BLM failed to engage meaningfully with stakeholders across the North Slope. It is clear that BLM had one outcome in mind and listened only to feedback consistent with its predetermined decision. BLM's artificially accelerated rulemaking and lack of transparency has led to numerous procedural irregularities, including multiple meeting with insufficient notice, cancelled meetings, and late-granted minimal extensions for filing comments that never allowed stakeholders sufficient time to make their voices heard.

103. Numerous North Slope communities and tribal entities lamented BLM's refusal to genuinely consider their comments to the Proposed Rule. For example, the President of Village of Wainwright made the following points:

> Overall, we strongly feel that this process has been rushed and we struggle to understand why numerous attempts from our region to slow down the process and be more deliberative and collaborative with local entities have been ignored. . . . . It seems that this current rulemaking process has provided a mockery of the purpose of the [NPR-A Working Group] and I for one am appalled at this Administration's continued use of the terms "Nation-to-Nation" and "Strengthening Relationships with Tribal Government," yet you

are doing just the opposite in this case.[89]

Likewise, the Mayor of Atqasuk stated "we do not feel like one public meeting in our community gives our people enough time to understand what is being proposed or the opportunity to provide meaningful comment on these proposed changes."[90]  The Mayor of the City of Utqiaġvik similarly stated:

> [W]e have serious concerns about the agencies' lack of consultation and collaboration with the people and entities that live in the NPRA and the precedence this sets for future changes in rulemaking procedures in our region. In my community, the largest on the North Slope, the BLM held only one 3-hour meeting for community members to learn about this rule. In Atqasuk, the agency never even held a meeting and in Wainwright, the meeting was held on December 4th, 3 days before the end of the public comment period. You have fallen short of the standards your own administration has set and you must do better in the future.[91]

104.    Finally, the Iñupiat Community of the Arctic Slope ("ICAS") was emphatic:

> To date, other than ill-fated attempts to schedule public hearings in our communities during the height of our fall subsistence whaling season, there has been no meaningful engagement with the people that will be directly impacted by this Proposed Rule. For an Administration that seeks to promote environmental justice—i.e., "addressing the disproportionate health, environmental, and economic impacts that have been borne primarily by communities of color – places too often left behind"—the failure to understand and apply that principle to the North Slope of Alaska, and the

---

[89]  Comment Letter from John Hopson, Jr. President Village of Wainwright dated December 7, 2023.

[90]  Comment Letter from Douglas Whiteman, Mayor City of Atqasuk dated December 7, 2023.

[91]  Comment Letter from Asisaun Toovak, Mayor City of Utqiagvik dated December 7, 2023.

Iñupiat who reside there, is unconscionable. For an Administration that seeks to "honor the perseverance and courage of Indigenous peoples" and respect their "resilience and survival," the unilateral development of this Proposed Rule (without any input or prior engagement with the affected entities that represent the Alaska Native communities located within and adjacent to the NPR-A) belies those noble sentiments.[92]

105.    BLM's failure to appropriately engage and listen to the voices of the elected leaders of the Iñupiaq community runs contrary to well-established policy mandates.    VOICE members include federally recognized tribes and ANCSA Corporations that have a government-to-government relationship with federal agencies under Executive Order 13175 - Consultation and Coordination With Indian Tribal Governments, and Congress's extension of EO 13175 to apply equally to ANCSA Corporations.[93]    While this legally required consultation eventually occurred, it was conducted in a manner that was an afterthought, with little to no actual consultation or results occurring.

106.    BLM's failure to listen to Native voices on the North Slope is also directly contrary to the current Administration's stated policies and promises to listen to Native and Tribal voices.    In 2020, then-presidential candidate Joe Biden promised to "ensure tribes have a seat at the table at the highest level of the federal government and a voice

---

[92] ICAS Comment Letter dated December 7, 2023.

[93] In 2004, through two consolidated appropriations acts, Congress required federal agencies to consult with Alaska Native corporations on the same basis as federally recognized Indian tribes under E.O. 13175 (Public Law (P.L.) 108-199, 118 Stat. 452, as amended by P.L. 108-447, 118 Stat. 3267).

throughout the government."[94]  Since being elected, President Biden has issued multiple

executive orders, memorandums, and statements affirming the Administration's

commitment to Tribal sovereignty and Tribal self-determination, including:

supporting robust Tribal economies,[95]  building physical and human infrastructure in

Indian Country,[96]  investing in Tribal Nations in the long term, establishing uniform

standards for Tribal Consultation,[97]  respecting Tribal sovereignty and commitment to

ushering in the next era of Tribal self-determination, [98]  and elevating Native American

voices.[99]

107.    In short, in rushing through the Final NPR-A Rule, BLM and the current

Administration made a conscious decision to disregard BLM's longstanding past practice

of engaging with local stakeholders in managing the NPR-A, ignored its obligations to

engage in direct tribal consultation, and disavowed its promises and commitments to

---

[94]   https://www.whitehouse.gov/dpc/briefing-room/2021/11/15/usa-today-op-ed-building-a-new-era-of-engagement-between-tribal-nations-and-the-federal-government/

[95]   2023-27318.pdf (govinfo.gov) ("We recognize the right of Tribal Nations to self-determination, and that Federal support for Tribal self-determination has been the most effective policy for the economic growth of Tribal Nations and the economic well-being of Tribal citizens.").

[96]   https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/15/fact-sheet-building-a-new-era-of-nation-to-nation-engagement/ this fact sheet references ARP and IIJA

[97]  Memorandum on Uniform Standards for Tribal Consultation | The White House

[98]   2023-27318.pdf (govinfo.gov) ("This order solidifies my Administration's commitment to this next era of Tribal self-determination policies…").

[99]   https://www.whitehouse.gov/briefing-room/statements-releases/2021/11/15/fact-sheet-building-a-new-era-of-nation-to-nation-engagement/

ensure meaningful tribal consultation and engagement when federal decisions will have a significant impact on Indigenous populations. BLM has claimed repeatedly that the Final NPR-A Rule speaks for the Native population on the North Slope. VOICE respectfully submits that BLM's claim is contradicted by the record.

<u>**COUNT I**</u>
<u>**The Final NPR-A Rule Fails to Comply with Multiple Federal Statutes**</u>
<u>**Including the NPRAPA, ANCSA, ANILCA, and NEPA**</u>

108. Plaintiff incorporates paragraphs 1 through 107 above as if specifically alleged or pleaded herein.

109. The Final NPR-A Rule constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court."[100] The APA requires courts to "hold unlawful and set aside" agency action that is: (a) "not in accordance with law,"[101] (b) "arbitrary," "capricious," or an "abuse of discretion";[102] and that is in "excess of statutory jurisdiction, authority or limitations, or short of statutory right."[103]

110. As set forth in detail above, the Final NPR-A Rule is not in accordance with law because it violates the text and purpose of the NPRPA, ANCSA, ANILCA, and improperly incorporates elements of FLPMA that do not apply in the NPR-A.

---

[100] 5 U.S.C. §§ 551(4), (13), 704.

[101] 5 U.S.C. § 706(2)(A).

[102] *Id.*

[103] 5 U.S.C. § 706(2)(C).

111.    BLM also did not prepare a NEPA EIS, asserting that the Final NPR-A Rule is of an "administrative, financial, technical, or procedural nature" and thus was exempt from the need for an EIS under 43 CFR § 46.210(i).  This conclusion is wholly unfounded and is inconsistent with over forty years of management where every other time there has been a similar level of change to BLM's NPR-A management it has prepared an EIS.  BLM's conclusion that it was not required to prepare an EIS in promulgating the Final NPR-A Rule is fatally flawed and contrary to NEPA.

112.    For these reasons, the Final NPR-A Rule should be vacated both as contrary to law and outside BLM's statutory authority, and as a violation of the APA because the Final NPR-A Rule is not in accordance with law, is in excess of statutory limitations, is arbitrary and capricious, and is an abuse of discretion.

## COUNT II
### The Final NPR-A Rule Is Arbitrary and Capricious as a Departure from Over Forty Years of Past Management

113.    Plaintiff incorporates paragraphs 1 through 112 above as if specifically alleged or pleaded herein.

114.    As set forth in detail above, BLM has abandoned managing the NPR-A for oil and gas leasing as mandated by Congress and, instead, has taken it upon itself to unilaterally turn the NPR-A into a *de facto* wilderness preserve without Congressional authorization.  In this way the Final NPR-A Rule represents an arbitrary, capricious, and wholly unfounded departure from how BLM has managed the NPR-A since its inception.

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 66 of 68

It is a complete change in agency policy implemented without acknowledgement or sufficient explanation of the new policy.[104]

115. For these reasons, the Final NPR-A Rule should be vacated under the APA as "arbitrary," "capricious," or an "abuse of discretion."[105]

<u>**COUNT III**</u>
<u>**The Final NPR-A Rule Is Invalid as the Result of a Flawed Process and Lack of Meaningful Stakeholder Engagement**</u>

116. Plaintiff incorporates paragraphs 1 through 115 above as if specifically alleged or pleaded herein.

117. As set forth in detail above, BLM engaged in an intentionally rushed process where it failed to listen to important stakeholders and only pretended to listen to the voices of the Iñupiat who live in and around the NPR-A. This flawed process denied multiple stakeholders adequate opportunity to be heard and resulted in fatally flawed agency rulemaking.

118. For these reasons, the Final NPR-A Rule should be vacated as arbitrary and capricious agency rulemaking under the Administrative Procedure Act.[106]

---

[104] *E.g.*, *Fed. Commc'ns Comm'n v/ Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").

[105] 5 U.S.C. § 706(2)(A).

[106] *Id.*

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 67 of 68

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for the following relief:

1.     An order declaring and adjudging that the Final NPR-A Rule is legally flawed and invalid;

2.     An order vacating and setting aside the Final NPR-A Rule;

3.     Appropriate injunctive relief, including enjoining the Defendants from allowing, authorizing, or approving any action in reliance on the Final NPR-A Rule;

4.     An award of all reasonable costs and attorneys' fees as authorized by law;

5.     For such other relief as this Court deems just and equitable.

DATED this 28th day of June 2024, at Anchorage, Alaska

                        ASHBURN & MASON, P.C.

                        By:     s/*Matthew T. Findley*
                                Matthew T. Findley
                                Alaska Bar No. 0504009

Case 3:24-cv-00136-SLG   Document 1   Filed 06/28/24   Page 68 of 68